[S. F. No. 5859. In Bank.—May 14, 1913.]

## CARL G. LARSEN, Respondent, v. ALL PERSONS, etc., Defendants; GEORGE W. GREENE, Appellant.

ESTABLISHMENT OF TITLE—MCENERNEY ACT—BOUNDARY LINE BETWEEN CONTIGUOUS TRACTS—FINDING—CONFLICT OF EVIDENCE.—In a proceeding under the so-called McEnerney Act, to establish title to certain land, which involved the determination of the location of the boundary line between contiguous tracts, it is held, in view of the conflict of the evidence, that the finding establishing the line as claimed by the plaintiff cannot be disturbed.

ID.—EVIDENCE OF TITLE—IMMATERIAL ERROR IN ADMITTING ABSTRACT OF TITLE.—Where the plaintiff's title to the land in question was otherwise sufficiently proven by documentary evidence and the admission of the parties, the error in permitting him to introduce in evidence abstracts of title after proof that the records had been destroyed, without proving the loss of the original deeds, was harmless.

ID.—PROOF OF PLAINTIFF'S POSSESSION—TITLE BY ADVERSE POSSESSION NEED NOT BE PROVED.—As a prerequisite to obtaining the relief pro-

vided for by the McEnerney Act, it is not necessary that the plaintiff, in proving his actual and peaceable possession of the land, should establish facts showing the acquisition of title by adverse possession under section 323 of the Code of Civil Procedure.

Id.—Fence as Evidence of Boundary and Possession.—A fence of posts and two wires erected by the plaintiff in such proceeding around the land, although of insufficient strength to turn cattle and not such an inclosure as would be required as proof of adverse possession, was sufficient to give notice to the world of the boundary line of the land described in the summons and posted on the land, and was sufficient in substance and character to indicate his possession and claim of ownership.

Id.—Sufficiency of Fence—Defendant Personally Appearing Cannot Question.—A defendant, who personally appeared in such proceeding and litigated the question of the title to the land, which was the real matter at issue, cannot attack the judgment rendered in favor of the plaintiff, merely on the ground of the insufficiency of the fence erected by the latter about the land.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial. George H. Buck, Judge presiding.

The facts are stated in the opinion of the court.

Charles F. Hanlon, George W. Greene, and Stephen Galvin, for Appellant.

Edward C. Harrison, and Maurice E. Harrison, for Respondent.

MELVIN, J.—This case was decided by the district court of appeal, and as we agree in part with the opinion of that court, prepared by Mr. Presiding Justice Chipman, and concur entirely in the conclusion reached, we hereby adopt a portion thereof.

"Plaintiff brings the action, under the so-called McEnerney Act, to quiet his title to certain fifty-two separate parcels of land. The only tract in controversy is designated as parcel 52, being a part of Outside Land Block No. 1259, in the city and county of San Francisco, and described as follows: 'Beginning at the southwesterly corner of W Street and Nineteenth Avenue; running thence southerly along the westerly

line of Nineteenth Avenue six hundred (600) feet; thence at right angles westerly forty-six (46) feet and four (4) inches; thence northerly six hundred (600) feet and ten (10) inches to a point on the southerly line of W Street, distant thereon fourteen (14) feet and eleven (11) inches westerly from said westerly line of Nineteenth Avenue; and thence easterly along said southerly line of W Street fourteen (14) feet and eleven (11) inches to its intersection with said westerly line of Nineteenth Avenue at the point of beginning.'

"Defendant, Greene, claims a portion of this land described as a strip 14 feet 11 inches wide along W Street and 15 feet 4 inches wide along the southerly boundary line of said block 1259. This strip of land fronts on Nineteenth Avenue 167 feet. Defendant also claims a frontage along Nineteenth Avenue of 26½ feet, as a roadway leading from said avenue to his remaining land in said and other blocks west of said avenue.

"Roughly, disregarding scale, the following diagram will show the respective contending claims of the appellant and respondent. The blocks are 240 by 600 feet.

"Plaintiff claims the parcel 14' 11" by 46' 4" as shown. Defendant claims 14' 11" by 15' 4", being the shaded westerly portion of the parcel claimed by plaintiff. Defendant's ownership of the blocks west of the land in dispute is con-

ceded. The disputed question of fact is as to the location of the dividing line between the Larsen and Greene land in block 1259, i. e., the east boundary of Greene's land which is coincident with Larsen's west boundary. Defendant denies plaintiff's ownership or right of possession and alleges that, in the year 1852, his father, W. H. Greene, 'in person made and filed upon a certain quarter section of land consisting of 160 acres which included section A of lot 52 a preemption claim in writing, describing said quarter section and describing in the same description all of said section A of lot 52' and entered into possession 'of all said land under claim of title in himself exclusive of other right, founding such claim upon a written instrument, to wit, the said pre-emption claim,' and continued in possession 'under such claim of title as aforesaid for five years and over, to wit, until the time of his death, which occurred on the 6th day of November, 1905'; that defendant, by the will of his father, succeeded to the rights of the latter as an heir and devisee and, ever since his father's death, has been in possession of said land under said pre-emption claim and by virtue of said will which was admitted to probate in 1906 by judgment duly given and made and that no appeal has been taken therefrom; that, during all said time from 1852 until his death, defendant's father occupied said land exclusively and adversely to all other persons as the owner thereof and defendant has continued such possession ever since his father's death. Defendant also claims a strip of land running across plaintiff's land and connecting with Nineteenth Avenue, as a roadway to and from defendant's land (roughly shown on above diagram) and alleges that the same was used by his father in his lifetime openly and notoriously and adversely to plaintiff and all other persons and that defendant continued such use after his father's death.

"The cause was tried by the court and plaintiff had findings and judgment in his favor. Defendant appeals from the judgment and from the order denying his motion for a new trial.

. . . . . . . . . . . . .

"Defendant's claim of a roadway across plaintiff's land based on adverse user has no sufficient evidence to support it. There was evidence that this road was used by defendant

under a verbal license.   Plaintiff testified: 'I gave Mr. Greene permission to go across it and to construct a driveway over this property and put some kind of a gate across the entrance to prove that I was the owner of it.'

"It is very difficult to determine from the record the effect of testimony given by witnesses as it appeared to the trial judge.   Maps and plats were introduced to which the witnesses would refer in a way to convey their meaning to the court, but which was not and perhaps could not well have been shown by the stenographer's notes.   Locations on a map were pointed to and statements were made concerning them which to us are unintelligible because the record fails to connect the locations with the statements."

Appellant. Greene contends that the evidence sustaining the existence of the dividing line in accordance with his claim was positive and unimpeached.   There was an abundance of evidence upon this subject.   Greene himself testified: "This fence of my father's is the same fence that was there in 1850, 1860, 1870, 1880, and 1890. . . . Q.   When did you put out these cypress trees?   A.   They were put out in 1882.   The cypress trees were planted just east of our fence on Hearst's property.   Q.   And how far east of the fence was the line of cypress trees?   A.   They ran I should judge from twenty to twenty-four inches; we planted them as near as we could. We could only plant on the east line of the fence, but we fenced on the north line of his property.   Q.   Did Mr. Hearst employ you and your father to put out these trees?   A.   He employed my father, he drove out one day and employed my father.   Q.   Were you present at any time after the trees had been put out when Mr. Hearst drove out there?   A.   Yes, sir.   Q.   State the substance of the conversation between your father and him at that time?   A.   I overheard Mr. Hearst talking to my father in regard to planting cypress trees on the east line of the property.   I heard him say to plant trees along the east line and also in his north line up to the San Miguel Ranch, which was done.   He did not talk to me, he was talking to my father.   Q.   I will ask you, after the trees had been set out did your father show him the lines where the cypress trees were?   A.   He saw the trees.   Q   And what did your father say in regard to where he put the trees? A. My father told Mr. Hearst that he had—Mr. Harrison

(interrupting) : Did you hear him? A. He saw the trees for himself. Mr. Hanlon: Q. Where was Mr. Hearst, or his buggy, standing at the time you heard him talking to your father? A. He was standing about in here. (Pointing to point east of block 1259 on map.) Q. Now, did Mr. Hearst see this fence? A. Yes, sir, and he never did claim any property inside of the fence. No, sir, he never claimed anything west of that line. Q. Did he make any objection to the trees being there? A. There never was any objection made. After Mr. Hearst came there and after my father had shown him the trees he, Mr. Hearst, said he was satisfied. Yes, sir, he said he was satisfied and that was after my father had told him that he had set the trees inside of this fence.''

A number of witnesses who had been familiar with the property for decades corroborated George W. Greene with reference to the proximity to the line of cypress trees of the fence forming the eastern boundary of the property of Greene's father. The surveyor, William Sanborn, who appeared at the trial as a witness on behalf of both Larsen and Greene, testified that he found the line of cypress trees on the property in 1908. Assuming the line of the old fence to be parallel with, but three feet west of a line drawn through the east sides of the cypress trees, he found that said line of fence would intersect the west line of Nineteenth Avenue one hundred and sixty-seven feet south of the south line of ''W'' Street, instead of missing Nineteenth Avenue altogether as does the line designated by Larsen.

When testifying as a witness for the plaintiff Mr. Sanborn detailed the procedure by which, commencing at a fence on the San Miguel Rancho as a known monument and using the field-notes of the official government survey of 1863 he found another line for the western boundary of Larsen's property. Of his cross-examination the opinion of the district court of appeal contains the following analysis:

''It appears from the cross-examination of the witness that he did not locate the disputed fence on the ground. His plat, exhibit 'D,' was a reproduction of what he 'obtained from the field-notes from the United States government.' The result of this survey was to show that the location of the fence in question, in October, 1863, was 26½ feet west of what is now Nineteenth Avenue at a point ˙12.70 feet south.

of W Street, a distance some feet further west than is neces-
sary to include all the land claimed by plaintiff. This fence,
as appeared by the evidence, was erected by defendant's
ancestor prior to 1863, and the testimony of defendant was
that it had never been changed. Exhibit 'B' is a U. S. sur-
vey which, with the field-notes, shows a fence crossing the
section line between sections 24 and 25, at a point 17.75
chains easterly from the common corner of sections 23, 24,
25 and 26, and also showing that the line, between sections
24 and 25, intersects the westerly line of said rancho 38.27
chains from said common corner at a point 6 chains north-
easterly from station 24 of the rancho as shown by the field-
notes. Exhibit 'D,' made by Surveyor Sanborn, shows the
location, with reference to existing lines of streets and blocks,
of said common corner, the fence in question and the rancho
boundary line, locating the fence as shown by the U. S. sur-
vey."

The superior court had before it, therefore, three estimates
of the proper line, Larsen's, Greene's, and Sanborn's. On
behalf of the respondent it was shown that Greene had asked
permission to build a road across Larsen's land from Nine-
teenth Avenue to the Trocadero and it is argued that this
would have been unnecessary if his father had owned front-
age on Nineteenth Avenue. It was shown, however, that the
road in question left Nineteenth Avenue south of the elder
Greene's frontage on that street (as claimed by appellant),
because of the conformation of the land, the private road
being located at the first place south of "W" Street where
Nineteenth Avenue and the land on its west side were on a
level. Some evidence was also introduced to the effect that
George W. Greene had stated to one Cook in 1900 that he
would not have to pay the "Nineteenth Avenue assessment"
but that Larsen would have to pay it. This, appellant as-
serts, could not be taken as an admission against interest,
because in 1900 his father was still alive and the appellant
had no title to block 1259. It is an admitted fact, however,
that neither W. H. Greene nor his father paid any assess-
ment for the opening of Nineteenth Avenue and that fact was
one proper for the consideration of the trial court. The ap-
pellant Greene introduced in evidence at the trial the record
of the probate proceedings in the estate of his father William

H. Greene, deceased, showing, among other things, that by the will of William H. Greene Block 1259 was devised to George W. Greene. This was doubtless offered as proof that the elder Greene claimed title to the disputed parcel of land, but the same record discloses the fact that, in the inventory and appraisement filed by Clara B. Greene, executrix of the said estate, the land was described as including all of block No. 1259 excepting the very strip here in litigation. These and other matters not necessary to detail here show that there was a substantial conflict of testimony regarding the dividing line at the west of Larsen's and east of Greene's land. Under our oft declared rule we will not disturb the finding of fact made by the trial court from such conflicting testimony.

Plaintiff was permitted to introduce in evidence certain abstracts of title after proof that the records had been destroyed. He failed to prove the loss of the original deeds, however, and the testimony regarding the contents of the abstracts was therefore erroneously admitted under the statute then in force (*Dahler* v. *All Persons etc.*, 163 Cal. 163, [124 Pac. 995]). The record does show, however, that the counsel for plaintiff offered in evidence a certified copy of a decree of distribution in the matter of the estate of George Hearst, deceased, dated April 25, 1892, distributing to Phoebe A. Hearst certain land "including the property in question." They also introduced in evidence the original deed of Phoebe A. Hearst to plaintiff Carl G. Larsen, dated April 6, 1898, and duly recorded, conveying to plaintiff certain property including that "in controversy." Appellant insists that, eliminating all of the evidence of the contents of the abstracts, still he has ample record proof of his title and in this view of the matter we agree with him. His counsel said in the oral argument of this case: "We introduced some abstract evidence out of an abundance of caution," but he argued that deraignment of title from original sources was in this case wholly unnecessary. Appellant Greene concedes that George Hearst owned the land adjoining his father's on the east. "This deraignment of the title," says counsel for plaintiff, "from the admitted owner Mr. Hearst to the plaintiff, by the original record and deed, coupled with the admission by the appellant, of title in Mr. Hearst, rendered superfluous any

proof of the contents of the abstract objected to; and its introduction therefore, if it should be deemed error, was harmless error.'' With this contention we agree.

We also adopt that portion of the opinion of the district court of appeal dealing with the sufficiency of plaintiff's possession of the property under the McEnerney Act. [Stats. 1906, (Ex. Sess.) p. 78]. It is as follows:

''Appellant contends that respondent cannot prevail in this action without first having proved that, before he brought the suit under the McEnerney Act, he must have shown 'the same adverse possession with all the strong elements required by section 323 of the Code of Civil Procedure as if he were proving adverse possession under that section.' (Citing *Lofstad* v. *Murasky*, 152 Cal. 64, ['91 Pac. 1008].)'' In *Vanderbilt* v. *All Persons*, 163 Cal. 511, [126 Pac. 160], speaking of the Lofstad case, the supreme court said: ''We do not think the court intended by its decision to hold that actual physical occupation by the owner or a tenant must be shown in all these cases; or that evidences of possession or occupancy such as under normal and ordinary conditions are required, and as pointed out in the opinion, must be made to appear in every case.'' The McEnerney Act does not require proof of title by adverse possession as a prerequisite to the relief to be given. It provides that an action may be brought under it by any person who claims an estate in real property and ''who by himself or his tenant, or any other person holding under him, is in the actual and peacable possession thereof,'' and requires that the complaint filed, and, of course, the proof, shall show the character of the estate which the plaintiff claims, and the possession he has, of the real property described in the complaint. (*Lofstad* v. *Murasky*, 152 Cal. 64, [91 Pac. 1008].) In that case the court was dealing with a complaint where nothing but constructive possession was shown or claimed. In the present case the character of the estate was fully shown and it appeared that, before commencing the action, plaintiff erected around the premises a fence of posts and wire. It was sufficient to give notice to the world of the boundary lines of the land described in the summons and posted on the land, and was sufficient in substance and character to indicate possession and claim of ownership. It was not of sufficient strength to turn cattle

and would not constitute such inclosure of land as would be required in a farming community as proof of adverse possession. What plaintiff did is thus testified to by him: "The fence was 2x2 pine posts. The posts were two inches wide by two inches thick, five feet eight long and about two feet in the ground, I guess. The posts projected from the ground up higher than the knee. They ran up about three feet above the ground and were twenty-five feet apart. I did not nail or put boards on them, but put two wires and fastened them to the posts by tying them around the post—just wrapped around the posts." But whatever may be said of the sufficiency of this fence, appellant cannot be heard to complain of the judgment so far as it affects him. The fence served its purpose as to him; he appeared and litigated the real question at issue—the title to the land—and the court had jurisdiction to determine this as well as all other questions involved in the controversy. "Where a defendant appears and answers the court may grant any relief consistent with the facts alleged in the complaint and embraced within the issues. (*Kent* v. *San Francisco Sav. Union,* 130 Cal. 401, 406, [62 Pac. 620].)"

The judgment and order are affirmed.

Henshaw, J., Shaw, J., Angellotti, J., and Sloss, J., concurred.

Rehearing denied.